**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180423-U

Order filed February 11, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| MARIAN C. MARION, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | |
| | ) | Appeal No. 3-18-0423 |
| GOVERNORS STATE UNIVERSITY and | ) | Circuit No. 15-L-157 |
| BOARD OF TRUSTEES OF GOVERNORS | ) | |
| STATE UNIVERSITY, | ) | Honorable |
| | ) | Raymond E. Rossi, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices McDade and Wright concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court did not err as a matter of law when it granted the defendants' motion for summary judgment.

¶ 2     The plaintiff, Marian C. Marion, was a tenured professor at Governors State University (GSU). Following her termination, she filed a complaint alleging that she was terminated in violation of the State Officials and Employees Ethics Act  (Ethics Act) (5 ILCS 430/1-1 *et seq.* (West 2010)). The defendants, Governors State University and Board of Trustees of Governors

State University, filed a motion for summary judgment, arguing that the Ethics Act was inapplicable. The trial court granted the defendants' motion for summary judgment.

¶ 3                                    FACTS

¶ 4         In August 2006, the plaintiff began a visiting professorship at GSU. In 2007, she received a tenured position in GSU's College of Education in the Early Childhood Education (ECE) Department. The plaintiff's employment with GSU was subject to a collective bargaining agreement between GSU and the University Professionals of Illinois.

¶ 5         In 2008, the plaintiff was in Italy for a study tour and met Tywanda Jiles. She encouraged Jiles to apply for an open position in GSU's ECE Department as an ECE professor. Jiles applied and was hired as an associate professor in September 2008. During Jiles's second teaching semester (January 2009 - May 2009), the plaintiff raised concerns with her supervisor, ECE Department Chair Colleen Sexton, that she had a lack of trust in Jiles's ability to do the job for which she had been hired. For example, the plaintiff stated that Jiles reneged on her agreement to assist the plaintiff with a class, she overheard Jiles "screaming" on the phone, Jiles's teaching and grading was poor, and Jiles was not completing assigned work. The plaintiff stated that she volunteered to mentor Jiles for teaching strategies, but Jiles did not take her up on it.

¶ 6         According to the plaintiff, during the first two years of Jiles's employment with GSU, she talked to Sexton about Jiles's "inability to do her job" around ten times. Sexton testified that the plaintiff raised these concerns during faculty meetings and spoke to Jiles "not in a way in which [she thought] someone should talk to a colleague." Sexton stated that the plaintiff and another tenured professor, Jeanine Klomes, raised issues about Jiles's teaching that went beyond "talking as colleagues" and characterized these comments as "hostile" and "directly attacking." Sexton observed Jiles leave faculty meetings in tears twice as a result of these comments.

¶ 7        In March 2010, the plaintiff received her annual evaluation for the preceding year. Sexton expressed "overall concerns" regarding the plaintiff's professional behavior. The evaluation was revised in May 2010 and the concerns expressed in the March 2010 version did not appear, but instead were the subject of a memorandum from Sexton to the plaintiff that was copied to her personnel file. The revision expressed Sexton's concerns about the plaintiff's professional behavior regarding a grade change that occurred in the Winter 2009 semester. Sexton noted that the plaintiff continued to misrepresent the situation factually, which made it a recurring issue.

¶ 8        In May 2010, Sexton sent a memorandum to the plaintiff expressing concerns of her professional behavior, specifically her (1) insistence that a junior faculty member (Jiles) was not knowledgeable and not qualified to work with a graduate student, (2) failure to understand that her conduct was upsetting or to consider expressing herself more constructively, and (3) directive that Sexton leave the plaintiff's office when Sexton sought to discuss this conduct. The memorandum also recounted the Winter 2009 grade change incident and other incidents where the plaintiff characterized a student as "stupid," spoke to Sexton in a raised voice and shook her finger at her, and told a student who was entitled to remain in a class that she had to withdraw. Sexton stated this behavior was unacceptable and should stop immediately.

¶ 9        In 2011, the plaintiff served on GSU's Personnel Committee, which gave her access to Jiles's portfolio. She came to believe that Jiles misrepresented her employment credentials. In March 2011, Sexton emailed the plaintiff: "I also am attaching *** the job description and ECE meeting minutes I came across[.] As you can see by the job description posted and used to hire Professor Jiles, her background qualifies her for the position she is currently holding." The plaintiff responded with two additional emails, again taking issue with Jiles's qualifications. She acknowledged that Sexton told her that Jiles's qualifications were sufficient, but that she also

3

understood that Sexton was wrong.

¶ 10        In June 2011, a union representative and GSU's Human Resources Vice President met with the plaintiff to discuss investigation findings relating to a complaint Jiles filed with human resources against the plaintiff and Klomes. In the fall of 2010, Jiles reported that she felt "bullied and harassed" and attributed the conduct to racial discrimination. The investigation found that the behavior by the plaintiff and Klomes was not racially motivated, but it was unprofessional and inappropriate. The Dean of the College of Education observed, "These behaviors (overt and covert) will not be tolerated since they have the potential for creating a hostile work environment. From this point forward, ECE meetings and interactions need to focus on program issues and not personal issues." She also advised, "[a]ll three-full faculty members in the ECE program are qualified to teach in the program. Further discussions on this matter are not needed."

¶ 11        In the fall of 2011, the plaintiff communicated with Jiles and certain faculty members at Walden University, the institution from which Jiles received her doctoral degree. Jiles's doctoral study identified the plaintiff as among experts who had been consulted while Jiles was developing her research questions. The plaintiff disputed that she had such involvement. The plaintiff demanded from Walden faculty members, "I will need to know what you are planning to do about the situation." Walden faculty responded, stating that there was no reason to believe any protocols had been compromised, and that Walden approved of Jiles's dissertation. The plaintiff continued to email Walden faculty members, declaring, among other things, that unless Walden removed her name from the work within a week, she would be contacting her attorney who will help them understand the gravity of the situation and demanding that they do not allow Jiles to use her good name and reputation. Walden faculty determined that contact with the plaintiff should be discontinued, unless through a Walden attorney. The plaintiff forwarded these

4

emails to GSU's human resources department and the Dean of the College of Education. The plaintiff opined that the emails eventuated because Walden responded to Jiles's "crybaby tactics."

¶ 12    In December 2011, the plaintiff received a "Notice of Written Sanction" from GSU's President concerning multiple instances of unprofessional conduct involving students, including using unfavorable student evaluations as a "tool for retribution." The sanction noted the plaintiff had been cautioned in May 2010 about unprofessional behavior, yet the problems continued.

¶ 13    Thereafter, the plaintiff's focus turned to Jiles's employment outside of GSU because she came to suspect that "there was something going on." The collective bargaining agreement applicable to the plaintiff and Jiles's employment with GSU permitted GSU's faculty to have a limited amount of additional, outside employment. In July 2012, the plaintiff sent requests pursuant to the Freedom of Information Act (FOIA) (5 ILCS 140/1 *et seq.* (West 2012)) to the State of Illinois Comptroller's office to learn about how much compensation Jiles received as an independent vendor for her developmental therapy work while operating Beginner's Depot, a sole proprietorship. The FOIA request revealed that Beginner's Depot was paid $2,253 in 2008; $17,420 in 2009; $61,836 in 2010; and $91,388 in 2011. In her deposition, the plaintiff stated she sought this information because the collective bargaining agreement only allowed them to work 1.5 days per week as an independent contractor or consultant and that amount cannot be exceeded, even if it is not interfering with GSU responsibilities.

¶ 14    In July 2012, the plaintiff sought to obtain information regarding how many courses Jiles had taught at Ellis University. Due to Ellis University's status as a private university, the plaintiff attempted to obtain this information by means that included presenting herself as a prospective student. The plaintiff's conduct led Ellis University's Vice President to email GSU's Dean of the

College of Education, stating that "[n]either my staff nor my vendors deserve to be harassed over what appears to be an internal squabble at [GSU]." He recounted that, over two days, the plaintiff contacted multiple Ellis University staff members and a vendor "attempting to bully or bluff her way into [the] information." Ellis University's Vice President also advised the Dean, based on his prior experience as a major crimes task force commander, that the plaintiff should be held accountable for her "boorish behavior," it should not be taken lightly, and it was disturbing enough that Jiles should be contacted.

¶ 15    Thereafter, in July 2012, GSU's Dean of the College of Education filed a "Red Flag Incident Report" with GSU's Campus Threat Assessment Team (CTAT). Jiles also filed a "Red Flag Incident Report." The CTAT had a goal to prevent campus violence by evaluating reports using a national rubric to assess risk levels—not to independently verify information. The Dean's report recounted the history between the plaintiff and Jiles and noted that she was very concerned about the plaintiff's behavior as she seemed unstable, she acted irrationally toward Jiles, and Jiles informed her that she does not feel safe around the plaintiff and is concerned what the plaintiff might do to her. Jiles's report noted the same behavior and she stated it had been ongoing for the past two and a half years, the plaintiff constantly pried into her personal life and looked for ways to defame her character, and that she did not feel safe with this type of behavior. CTAT issued an evaluation and assessed the plaintiff's conduct as a "severe disturbance" and rated her level of aggression as "win/lose attack." The plaintiff's behavior was classified as "unusual and/or bizarre acting, destructive, apparently harmful to others."

¶ 16    On August 4, 2012, the plaintiff filed a complaint against Jiles with the Office of the Executive Inspector General's office (OEIG), noting Jiles's (1) operation of Beginner's Depot (along with her FOIA request results), (2) teaching at Ellis University, (3) excessive computer

and telephone use during meetings, (4) teaching or consulting work on GSU official time, and (5) lack of job qualifications.

¶ 17    On August 16, 2012, GSU President sent the plaintiff a letter entitled "Notice of Immediate Leave with Pay" and "Notice of Meeting to Discuss Intent to Terminate and Possible Resolution." The letter advised the plaintiff that she was placed on leave, discharge would be considered, there would be a meeting to discuss health and safety issues raised by CTAT, and GSU had responsibilities under the collective bargaining agreement to ensure fair treatment, respect, and safety. The letter also informed the plaintiff that she needed approval from the Public Safety Department to return to campus.

¶ 18    On August 20, 2012, the plaintiff filed with the OEIG "additional information" for her complaint filed at the beginning of the month. This additional information consisted of details of the June 2011 meeting when Jiles's harassment complaint was discussed. The plaintiff's account of that meeting was that she was being told to be "nicer" to Jiles.

¶ 19    On August 21, 2012, the plaintiff was notified by GSU's Chief of Campus Police that she was not allowed on campus until her assigned meeting date.

¶ 20    On August 28, 2012, the plaintiff filed a second OEIG complaint naming GSU's Dean of the College of Education, GSU's Human Resources Vice President, GSU's President, Sexton, and Jiles. She claimed that she was served a notice of no trespassing in retaliation for filing complaints about another GSU employee. The OEIG referred both of the plaintiff's complaints to GSU for investigation, and GSU's President forwarded these complaints to GSU's Ethics Officer for further action.

¶ 21    In December 2012, GSU President sent the plaintiff a "Notice of Intent to Seek Termination," citing a September 2012 meeting with the plaintiff, her union, and her attorneys,

7

noting, "[e]fforts to resolve the matter without termination have been unsuccessful." GSU President relayed that she was recommending discharge based on (1) the red flag reports, (2) CTAT's evaluation of the plaintiff's behavior as a severe disturbance with a significant risk of aggression, (3) GSU's commitment under the collective bargaining agreement to facilitate a community of fair treatment and respect, and (4) GSU's civility policy.

¶ 22 GSU's President also reported findings to the OEIG based on the plaintiff's two complaints. GSU discovered that Jiles only completed about 10 hours of work at Beginner's Depot per month and that the remainder of the fees went to consultants other than Jiles. GSU's President believed that this work was appropriate as it was limited in time and advanced Jiles's experience in many ways. Additionally, GSU found that Jiles's teaching at Ellis University was within the guidelines prescribed under the collective bargaining agreement. Last, the report noted that Jiles's use of technology was appropriate and non-distracting and GSU was "satisfied that Dr. Jiles's conduct had been consistent with her obligations and responsibilities as a member of the faculty and a State employee." Regarding the plaintiff's no trespassing complaint, GSU found that the plaintiff's suspension and related acts (1) resulted from the CTAT evaluation deeming her behavior disturbed and aggressive, (2) were consistent with GSU's disciplinary procedures and the collective bargaining agreement, and (3) had no retaliatory basis.

¶ 23 In January 2013, the GSU Provost notified the plaintiff that employees served with a termination notice had a right to a hearing before a panel of five employees from the same bargaining unit, and identified the hearing panel selected. In March 2013, GSU President sent the plaintiff a notice setting forth the date of the termination hearing and reviewed the grounds for discharge (CTAT's evaluation of the plaintiff's behavior and how it was inconsistent with GSU's obligations under the collective bargaining agreement and its civility policy).

¶ 24    On March 28, 2013, the plaintiff filed her third OEIG complaint, naming GSU President, GSU Dean of the College of Education, GSU Human Resources Vice President, and GSU's Chief of Campus Police. She claimed that "CTAT [was] trying to terminate her because she [had] filed multiple complaints with the OEIG." The OEIG again referred this complaint to GSU for investigation.

¶ 25    In April 2013, the discharge hearing was held. GSU President, GSU Dean of the College of Education, Jiles, and a former CTAT member testified before the hearing panel of bargaining unit employees. In May 2013, the panel of bargaining unit employees determined that GSU demonstrated grounds to discharge the plaintiff because of her interactions with Ellis University, in aggregate with other investigative actions, affected and impaired her ability to fulfill her professional duties to GSU by failure to cease investigation after reporting her concerns to her department and administration. The panel noted that the compelling evidence included threats and misrepresentations to Ellis University and its vendor.

¶ 26    In August 2013, pursuant to the collective bargaining agreement, GSU's Board passed a resolution terminating the plaintiff's employment. In December 2014, following a grievance by the plaintiff's union, her discharge was upheld by an arbitrator. The arbitrator found that the discharge was supported with cause and consistent with the collective bargaining agreement.

¶ 27    In March 2015, the plaintiff filed her initial complaint. In October 2017, she filed her second amended complaint alleging that GSU violated section 15-10 of the Ethics Act (5 ILCS 430/15-10 (West 2010)) by suspending and discharging her from her faculty position in alleged retaliation for reporting Jiles's conduct to her supervisors and the OEIG. The plaintiff claimed that her complaints relating to Jiles were based on a violation of the University Faculty Research and Consulting Act (UFRCA) (110 ILCS 100/0.01 *et seq.* (West 2010)) and the collective

9

bargaining agreement. In April 2018, GSU moved for summary judgment, arguing that the plaintiff failed to show an Ethics Act violation and that she engaged in a protected activity. GSU also argued that the plaintiff's complaints were not a contributing factor to her termination.

¶ 28    Following a hearing, the trial court granted GSU's motion for summary judgment. The court noted, contrary to the plaintiff's claims of retaliation, there appeared to be a well-documented campaign of harassment by the plaintiff against Jiles. The court determined that the plaintiff could not demonstrate that she disclosed information that she reasonably believed violated a "law, rule, or regulation" as the Ethics Act required. Rather, the court found that the plaintiff's complaints to her supervisors and the OEIG merely pertained to perceived violations of GSU policy or the collective bargaining agreement—and did not trigger the Ethics Act. Last, the court noted that the record was devoid of any evidence demonstrating that the plaintiff's OEIG complaints or any other of her many complaints were a consideration, much less a contributing factor, to her termination. The plaintiff appeals.

¶ 29                                          ANALYSIS

¶ 30    At the outset, the defendants argue that the plaintiff's statement of facts in her appellant brief fail to comply with Illinois Supreme Court Rule 341(h)(6) (eff. Nov. 1, 2017) in many ways and asks this court to dismiss her appeal, impose sanctions, or not consider them. Specifically, the defendants argue that the plaintiff's statement of facts is incomplete, inaccurate, and argumentative. We agree with the defendants that the plaintiff's statement of facts contains violations rendering them unusable. For example, among other things, the plaintiff inaccurately claims that the Dean of the College of Education filed her "Red Flag Incident Report" with CTAT *after* the plaintiff filed her first OEIG complaint, perhaps suggesting that the Dean's filing of this report was retaliatory. However, the record actually shows that the Dean filed her report

10

on July 25, 2012, and the plaintiff filed her first OEIG complaint afterwards on August 4, 2012. Despite the violations contained in the plaintiff's brief, we exercise our discretion in declining to dismiss this appeal or impose sanctions because the record is not long, and the issues presented are simple. See *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999). Instead, we will consider the defendants' statement of facts along with a thorough examination of the record before us.

¶ 31 On appeal, the plaintiff raises several arguments to support her proposition that the trial court erred as a matter of law when it granted the defendants' motion for summary judgment. We first address whether the evidence presented supported her claim that her reporting activity was protected under the Ethics Act as we find that it is dispositive.

¶ 32 Summary judgment is proper when the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 2018). "The purpose of summary judgment is not to try an issue of fact but to determine whether one exists." *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Summary judgment is a drastic means of disposing of litigation and should only be allowed when the right of the movant is clear and free from doubt. *Id.* In ruling on a motion for summary judgment, the trial court must construe the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22.

¶ 33 A defendant moving for summary judgment bears the initial burden of proof and may meet this burden either by affirmatively showing that an element of the case must be resolved in its favor or by establishing that there is an absence of evidence to support the plaintiff's case. *Ross Advertising, Inc. v. Heartland Bank & Trust Co.*, 2012 IL App (3d) 110200, ¶ 28. To withstand a defendant's motion for summary judgment, a plaintiff need only present a factual

11

basis that would arguably entitle the plaintiff to a judgment, *i.e.*, a genuine issue of fact. *Id.* "On appeal from an order granting summary judgment, a reviewing court must consider whether the existence of a genuine issue of material fact should have precluded dismissal or, absent such an issue of fact, whether summary judgment is proper as a matter of law." *Monson*, 2018 IL 122486, ¶ 12. We review the circuit court's summary judgment ruling *de novo*. *Id.*

¶ 34　　　　Article 15 of the Ethics Act provides for Whistle Blower Protection. Section 15-10(1), the particular section at issue here, provides, as follows:

>"An officer, a member, a State employee, or a State agency shall not take any retaliatory action against a State employee because the State employee *** [d]iscloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee *reasonably believes is in violation of a law, rule, or regulation.*" (Emphasis added.) 5 ILCS 430/15-10(1) (West 2010).

A violation of section 15-10 may only be established upon a finding that (1) the State employee engaged in conduct described in section 15-10 and (2) that conduct was a contributing factor in the retaliatory action alleged by the State employee. 5 ILCS 430/15-20 (West 2010). "It is not a violation, however, if it is demonstrated by clear and convincing evidence that the officer, member, other State employee, or State agency would have taken the same unfavorable personnel action in the absence of that conduct." 5 ILCS 430/15-20 (West 2010).

¶ 35　　　　Therefore, we must first determine whether the plaintiff's reporting activity fell within section 15-10(1). Specifically, whether she disclosed conduct that she reasonably believed was in violation of a law, rule, or regulation. To satisfy this requirement, the plaintiff relies on her reporting of Jiles's additional jobs, operating Beginner's Depot and teaching at Ellis University,

12

arguing that she reasonably believed that Jiles concurrently violated (1) section 1 of the UFRCA and (2) article 4.3(1)(b) of the collective bargaining agreement.

¶ 36     Section 1 of the UFRCA provides, as follows:

"No full time member of the faculty of any State-supported institution of higher learning may undertake, contract for or accept anything of value in return for research or consulting services for any person other than that institution on whose faculty he serves unless (a) he has the prior written approval of the President of that institution, or a designee of such President, to perform the outside research or consulting services, such request to contain an estimate of the amount of time which will be involved, and (b) he submits to the President of that institution or such designee, annually, a statement of the amount of actual time he has spent on such outside research or consulting services." 110 ILCS 100/1 (West 2010).

¶ 37     The plaintiff argues that article 4.3(1)(b) of the collective bargaining agreement provides the same requirements contained within section 1 of the UFRCA, but with added detail. For example, article 4.3(1)(b) requires faculty engaged in outside employment "to avoid distraction from one's full time-teaching position at GSU" and "to limit the number of hours a full-time professor may be employed outside GSU." Thus, the plaintiff argues, article 4.3(1)(b) of the collective bargaining agreement and the UFRCA are intertwined. Essentially, she argues that a complaint of an article 4.3(1)(b) violation is akin to complaining of a UFRCA violation, and, thus, she reported what she reasonably believed to be a violation of a law, rule, or regulation.

¶ 38     We reject the plaintiff's argument that a complaint pertaining to article 4.3(1)(b) of the collective bargaining agreement is the same as complaining of a UFRCA violation. In fact, the record is devoid of any indication that *any* of the plaintiff's numerous complaints founded on

13

article 4.3(1)(b) of the collective bargaining agreement were premised on the UFRCA. The plaintiff acknowledges that she never mentioned the UFRCA in her complaints, but argues that we should take a substance over form approach and that her complaints generally challenged Jiles's outside employment and, thus, fell within the scope of the UFRCA.

¶ 39    Even taking a substance over form approach, the plaintiff's argument still fails. Generally, the UFRCA only imposes the requirements that a full-time faculty member (1) receives prior written approval for outside employment with an estimate of the time involved and (2) submits an annual statement stating the actual time spend on the outside employment. The plaintiff's attempt to recharacterize her reporting activity upon the filing of her complaint in this case is unavailing. Her complaints were that Jiles (1) operated Beginner's Depot, (2) taught at Ellis University, (3) excessively used her computer and telephone during meetings, (4) taught for another institution or consulted on GSU official time, and (5) lacked job qualifications. *Supra* ¶ 16. These complaints pertained to what she believed to be violations of the collective bargaining agreement and GSU's policies and are not considerations of the UFRCA. Thus, it is clear that the plaintiff's reporting did not contain alleged UFRCA violations, and we decline her request to broadly find *any complaint pertaining to outside employment* within the purview of the UFRCA.

¶ 40    In sum, the record does not show that the plaintiff reasonably believed that she was reporting a violation of a law, rule, or regulation. Again, the plaintiff's complaints about Jiles pertained to Jiles's (1) operation of Beginner's Depot, (2) teaching at Ellis University, (3) excessive computer and telephone use during meetings, (4) teaching or consulting work on GSU official time, and (5) lack of job qualifications. *Supra* ¶ 16. These issues clearly concerned the collective bargaining agreement and GSU internal policies, which the plaintiff seemingly understood. The following questioning occurred during her deposition:

14

"Q. If you can answer, can you tell me what laws, rules, regulations you thought Dr. Jiles was breaking that caused you then to file the OEIG complaints.

A. We have an agreement, the [collective bargaining] agreement. It specifies *** your work as a faculty member. Your primary responsibility is *** your teaching job. You are allowed to go out and do extra work. It's limited by the agreement. I was only concerned about how much she seemed to be doing by the *** vouchers that had been submitted and paid to her. And I got this information through a FOIA request. It just seemed unbelievable that somebody could make $91,000 as a private vendor while you also, in that short time period, *** have a GSU full-time job."

¶ 41 The plaintiff admitted that she was reporting what she believed to be a violation of "an agreement." For reasons previously discussed, the plaintiff's reported violations of the collective bargaining agreement were not covered under the UFRCA and did not constitute disclosure of a law, rule, or regulation violation under the Ethics Act. Thus, it was not reasonable for the plaintiff to believe that the collective bargaining agreement, a contract, was a law, rule, or regulation under the facts and circumstances of this case. Therefore, we need not address whether the plaintiff's reporting was a contributing factor in the alleged retaliatory action or whether GSU would have taken the same unfavorable personnel action in the absence of that reporting. See 5 ILCS 430/15-20 (West 2010). For the foregoing reasons, we find that the trial court properly granted the defendants' motion for summary judgment.

¶ 42                                                       CONCLUSION

¶ 43 For the foregoing reasons, the judgment of the circuit court of Will County is affirmed.

¶ 44 Affirmed.

15